IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ADOTE G. AKWEI               :

                                :

    v.                       :   Civil Action No. DKC 15-1095

                                :

SYLVIA MATHEWS BURWELL,
Secretary, Department of Health :
and Human Services

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this employment discrimination case is a motion to dismiss or, in the alternative, for summary judgment filed by Defendant Sylvia Mathews Burwell, Secretary of the United States Department of Health and Human Services ("Defendant"). (ECF No. 19). The issues have been fully briefed, and the court now rules, no hearing being deemed necessary. Local Rule 105.6. For the following reasons, Defendant's motion to dismiss or, in the alternative, for summary judgment will be granted.

**I.  Background**

    **A.  Factual Background**

Unless otherwise noted, the facts outlined here are undisputed and construed in the light most favorable to Plaintiff Adote Akwei ("Plaintiff"). Additional facts will be discussed in the analysis section. Plaintiff, a black, Christian male of African descent, worked in the Office of

Acquisitions ("OA") at the National Institutes of Health ("NIH") as a government contractor employed by Interior Systems Incorporated Professional Services ("ISI") from July 2006 until April 2011. (ECF Nos. 19-1, at 3; 25-2, at 1). Until June 2008, Plaintiff was working as a "Clerk/Typist" and was one of several contractors within the OA. In June 2008, the NIH restructured the OA, converting all but one contractor position to federal government employee positions. (ECF No. 19-6 ¶ 3). Plaintiff was selected for the one remaining contractor position and began working at the reception desk in the OA front office. (*Id.* ¶ 4). After the reorganization, Plaintiff's title was initially a "Junior Quality Assurance Specialist, but it was changed to a "Clerk/Typist/Program Analyst" in September 2010. (ECF Nos. 19-12; 19-22). In this most recent role, Plaintiff's expected job duties were to: organize and complete all clerical typing duties as assigned; keep office files and task orders updated and prepare reports as required; take messages for personnel and assist management with clerical and typing needs; act as time keeper; procure and maintain office supplies; and "other duties as required." (ECF No. 19-2, at 2).

For the first two years Plaintiff worked at the OA reception desk, Melissa Richardson served as the OA Director. (*See* ECF No. 25-13, at 2-3). In an affidavit submitted as part of the Equal Employment Opportunity Commission's (the "EEOC")

investigation into Plaintiff's allegations, Ms. Richardson noted that she "had no problems with [Plaintiff's] work because he was able to perform the tasks [she] assigned to him," which included answering phones and greeting visitors, picking up and distributing the mail, filing documents, gathering and collating documents for Freedom of Information Act requests, delivering packages to offices, gathering supply orders, and "other related administrative support activities necessary to assist the operation of OA."   (ECF No. 25-13, at 4).   Ms. Richardson, recognizing that Plaintiff's new role included "evolving tasks" of increased complexity, suggested to Plaintiff's supervisor at ISI that Plaintiff enroll in various training classes that would assist him in performing his new job functions.  (*Id.*).

After Ms. Richardson was reassigned in January 2010, Pat Rice became the Acting Director of the OA.  (*See* 19-4, at 1-2; 25-13, at 3).   According to Mr. Rice, Plaintiff's job description required significantly more than the receptionist and administrative support duties Plaintiff was performing. (ECF No. 19-4, at 3).  Mr. Rice believed that Plaintiff "did not demonstrate these skills nor did he complete any tasks related to the majority of these requirements[,] requiring others to perform these tasks." (*Id.*).   Accordingly, Mr. Rice suggested to Plaintiff and Robert England, Plaintiff's supervisor at ISI, that Plaintiff take training courses offered by the NIH or ISI.

(*Id.* at 5).   Plaintiff asserts that he was denied training that he requested in July 2010.   (ECF No. 25-2, at 20).   Despite several suggestions by Mr. Rice and Mr. England that he take additional training, Plaintiff did not enroll in any of the suggested substantive training courses.[1]  Plaintiff contends that Mr. Rice made multiple derogatory remarks about him and his performance.   Specifically, Mr. Rice asked Plaintiff to speak more loudly and clearly on the phone, and Plaintiff alleges that Mr. Rice noted that he could not understand Plaintiff due to his accent.   (ECF No. 19-3, at 3).   Plaintiff also avers that he overheard Mr. Rice tell another employee, "You know that [Plaintiff] cannot amount to anything."   (*Id.* at 9).   Ericka Mack, one of Plaintiff's colleagues avers that Mr. Rice told her that Plaintiff's employment was terminated because Plaintiff "lacked a sufficient level of skill and did not have the appearance to be the 'face of the office,'" which Ms. Mack believed referred "to the fact that [Plaintiff] wore jeans everyday rather than business casual."   (ECF No. 19-7, at 4).

According to Mr. Rice, other employees complained about Plaintiff's work because they were taking on tasks originally

---

[1] Although Plaintiff attaches training certificates to his response, they are for basic introductory trainings, including information security awareness, diversity awareness, and sexual harassment prevention trainings from 2007 through 2009.   (ECF No. 25-14).   These trainings, while undeniably important, are not the type of trainings that Mr. Rice encouraged Plaintiff to take in order to enhance his substantive skills.

4

assigned to Plaintiff.  (ECF No. 19-4, at 3-4).  Mr. Rice also believed that Plaintiff was overusing the Internet for personal use; furthermore, he was unsatisfied with Plaintiff's communication skills, particularly in answering the main OA phone line.  (*Id.* at 4).     Plaintiff also often played religious music at his desk, which Mr. Rice requested he not do during business hours.

On February 23, 2011, Mr. Rice requested a meeting with Mr. England "to discuss the work performance of [Plaintiff]."  (ECF No. 19-16).  According to Mr. England, Mr. Rice "stated that even though [Plaintiff] is at the front desk, his duties require more than him just answering the phone and that he should be performing other duties as well."  (*Id.*).  Mr. England met with Plaintiff to convey Mr. Rice's concerns and to provide suggestions for improvement.  (ECF No. 19-17).  On March 28, Mr. Rice and other supervisors at the NIH requested another meeting with Mr. England to discuss Plaintiff's continued poor performance.  (ECF No. 19-18).  Mr. Rice "stated that there had not been any substantial improvement" in Plaintiff's work performance and he had not signed up for any training classes. (*Id.*).  Plaintiff's NIH supervisors believed that "they were not getting the work or the value from the position that is required to support the office and the Director" and that "they needed someone with greater skill sets with Microsoft Office Suite and

5

handling front desk duties." (*Id.*). According to Mr. England, "NIH stated that they no longer needed the services of [Plaintiff]." (*Id.*). Following this meeting, Mr. England removed Plaintiff from the position at the NIH. (ECF No. 19-8, at 3). Because ISI had no other open contractor positions, it terminated Plaintiff's employment.

### B.   Procedural History

On April 27, 2011, Plaintiff contacted an Equal Employment Opportunity ("EEO") counselor at the United States Department of Health and Human Services ("HHS"), the department of which the NIH is a part. (ECF No. 19-23). On July 4, Plaintiff filed a formal EEO complaint asserting the following claims of discrimination based on race, religion, and national origin: wrongful termination; denial of training; hostile work environment due to Mr. Rice's derogatory comments about Plaintiff's accent and lack of competence; and discriminatory restriction on playing religious music. (ECF No. 19-24). After conducting an investigation and reviewing the record, the HHS EEO office determined that Plaintiff "has not met his burden of persuasion to show by a preponderance of the evidence that he was discriminated against or subjected to harassment based on his race, national origin[, or] religion." (ECF No. 19-25, at 16). Plaintiff appealed the decision to the EEOC, which affirmed the HHS EEO determination and denied Plaintiff's

request for reconsideration on February 25, 2015. (ECF Nos. 19-26; 19-27).

On April 16, Plaintiff, proceeding *pro se*, filed a complaint in this court asserting discrimination and harassment claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.* (ECF No. 1). After multiple motions to extend time, Defendant filed the pending motion to dismiss or, in the alternative, for summary judgment. (ECF No. 19). Plaintiff responded (ECF No. 25), and Defendant replied (ECF No. 28).

## II. Standard of Review

Defendant has moved to dismiss or, in the alternative, for summary judgment. Ordinarily, a court cannot consider matters outside the pleadings or resolve factual disputes when ruling on a Rule 12(b)(6) motion to dismiss. *See Bosiger v. U.S. Airways,* 510 F.3d 442, 450 (4th Cir. 2007). If the court does consider matters outside the pleadings, "the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed.R.Civ.P. 12(d); *see also Finley Lines Joint Protective Bd. Unit 200 v. Norfolk S. Corp.,* 109 F.3d 993, 997 (4th Cir. 1997) ("[A] Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for summary judgment until the district court acts to

7

convert the motion by indicating that it will not exclude from its consideration of the motion the supporting extraneous materials."). Here, both parties submit extraneous materials, and Plaintiff had notice of a potential conversion to summary judgment by virtue of the motion filed by Defendant. *See Warner v. Quilo*, No. ELH-12-248, 2012 WL 3065358, at *2 (D.Md. July 26, 2012) ("When the movant expressly captions its motion 'in the alternative' as one for summary judgment, and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur[.]") (quoting *Laughlin v. Metro. Wash. Airports Auth.,* 149 F.3d 253, 261 (4th Cir. 1998)).  Accordingly, Defendant's motion will be treated as one for summary judgment.

Summary judgment is appropriate under Fed.R.Civ.P. 56(a) when there is no genuine dispute as to any material fact, and the moving party is plainly entitled to judgment in its favor as a matter of law.  In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986), the Supreme Court of the United States explained that, when considering a motion for summary judgment, the "judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.* at 248.  Thus,

"the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Id.* at 252.

In undertaking this inquiry, a court must view the facts and the reasonable inferences drawn therefrom "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *see also EEOC v. Navy Fed. Credit Union,* 424 F.3d 397, 405 (4th Cir. 2005). The mere existence of a "scintilla" of evidence in support of the nonmoving party's case is not sufficient to preclude an order granting summary judgment. *See Liberty Lobby,* 477 U.S. at 252. A "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences." *Shin v. Shalala,* 166 F.Supp.2d 373, 375 (D.Md. 2001) (citation omitted). Indeed, this court has an affirmative obligation to prevent factually unsupported claims and defenses from going to trial. *See Drewitt v. Pratt,* 999 F.2d 774, 778-79 (4th Cir. 1993) (quoting *Felty v. Graves-Humphreys Co.,* 818 F.2d 1126, 1128 (4th Cir. 1987)).

Although *pro se* litigants are to be given some latitude, the above standards apply to everyone. Thus, as courts have recognized repeatedly, even a *pro se* party may not avoid summary

judgment by relying on bald assertions and speculative arguments. *See Smith v. Vilsack*, 832 F.Supp.2d 573, 580 (D.Md. 2011) (citing cases).

## III. Analysis

### A. Employer-Employee Relationship

As a threshold matter, Defendant contends that Plaintiff's claims must be dismissed because Plaintiff was not an employee of the NIH but was rather an employee of ISI. (ECF No. 19-1, at 13-21; 28, at 2-7).[2] Plaintiff does not dispute that he was an employee of ISI, but asserts that he also had an employer-employee relationship with the NIH. (ECF No. 25-2, at 3). In effect, Plaintiff contends that the NIH was a joint employer with ISI.

"An entity can be held liable in a Title VII action only if it is an 'employer' of the complainant." *Butler v. Drive Automotive Indus. of Am., Inc.*, 793 F.3d 404, 408 (4th Cir. 2015). Even if an entity is not a plaintiff's formal employer,

---

[2] Defendant frames the discussion regarding the employer-employee relationship as one implicating subject matter jurisdiction. This court has held, however, that a defendant's status as a plaintiff's employer for purposes of Title VII "is better suited to a Rule 12(b)(6) [or summary judgment] analysis, as the question implicates the merits of [a] plaintiff's claim." *Gilbert v. Freshbikes, LLC*, 32 F.Supp.3d 594, 600 (D.Md. 2014); *see also Murphy-Taylor v. Hofmann*, 968 F.Supp.2d 693, 724 (D.Md. 2013) ("[A] defendant's qualification as the 'employer' of a Title VII plaintiff constitutes a substantive 'element of [the] plaintiff's claim for relief, not a jurisdictional issue.'" (quoting *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 516 (2006)).

it may be an "employer" under the joint employer doctrine if it exercises "sufficient control of the terms and conditions of [the plaintiff's] employment." *Id.* (internal quotation marks omitted) (citing *Torres-Negron v. Merck & Co.*, 488 F.3d 34, 40 n.6 (1st Cir. 2007)).   In *Butler*, the United States Court of Appeals for the Fourth Circuit held that the joint employer doctrine applies to actions brought under Title VII, and "multiple entities may simultaneously be considered employers." *Id.* at 409-10.   The Fourth Circuit reasoned that the joint employment doctrine "prevents those who effectively employ a worker from evading liability by hiding behind another entity, such as a staffing agency." *Id.* at 410.

In determining whether an entity is an employer under the joint employer doctrine, the Fourth Circuit has directed that district courts look at the following factors:

(1)   authority to hire and fire the individual;

(2)   day-to-day supervision of the individual, including employee discipline;

(3)   whether the putative employer furnishes the equipment used and the place of work;

(4)   possession of and responsibility over the individual's employment records, including payroll, insurance, and taxes;

11

(5)   the length of time during which the individual has

worked for the putative employer;

(6)   whether the putative employer provides the individual

with formal or informal training;

(7)   whether the individual's duties are akin to a regular

employee's duties;

(8)   whether the individual is assigned solely to the

putative employer; and

(9)   whether the individual and putative employer intended

to enter into an employment relationship.

*Id.* at 414.[3]   None of these factors are dispositive, and the element of control remains the "principal guidepost" in determining if an entity is a plaintiff's "employer." *Id.*

> Three factors are the most important. The first factor, which entity or entities have the power to hire the putative employee, is important to determining ultimate control. The second factor, to what extent the employee is supervised, is useful for determining the day-to-day, practical control of the employee. The third factor, where and how the work takes place, is valuable for determining how similar the work functions are compared to those of an ordinary employee.

---

[3] Defendant's motion cites to factors from outdated case law. As the Fourth Circuit noted in *Butler*, such factors "include considerations that are irrelevant to the joint employment context." *Butler*, 793 F.3d at 414. Defendant, perhaps recognizing the same, focuses her reply on the appropriate *Butler* factors. (ECF No. 28, at 3-7).

*Id.* at 414-15. Conversely, the ninth factor regarding the subjective intent of the parties "ordinarily will be of minimal consequence." *Id.* at 414 n.12. Applying the factors, particularly the three key factors, illustrates that, at least, there is a factual dispute as to whether the NIH was Plaintiff's "employer."

As to the first factor, although ISI had the ultimate authority to hire and fire Plaintiff, the NIH played a significant role in Plaintiff's selection and removal. The NIH determined what positions would be filled by contractors and what the requirements for such positions were. (*See* ECF No. 28, at 14 (noting that "only NIH is in a position to assess" if the requirements for a position are being met)). Plaintiff could not have worked in his position without approval of officials at the NIH. *See Crump v. TCoombs & Assocs., LLC*, No. 2:13-cv-707, 2015 WL 5601885, at *19 (E.D.Va. Sept. 22, 2015) (holding that the first factor indicated that the Navy was the plaintiff's employer because "the Navy had *some* role in hiring the [p]laintiff, [as] . . . it set the qualifications" for the position).

Similarly, there is evidence that individuals at the NIH, such as Mr. Rice, were instrumental in the termination of Plaintiff's employment. The NIH requested two meetings with Mr. England to discuss concerns with Plaintiff's performance. (ECF

13

Nos. 19-16; 19-18).  Plaintiff's employment was terminated only after NIH officials informed Mr. England that "they no longer needed the services of [Plaintiff]."  (ECF No. 19-18).  In *Butler*, 793 F.3d at 415, the defendant sent an e-mail to the contracting company "directing that [the plaintiff] be added to the list for replacement."  The contracting company then, "after a delay," terminated the plaintiff.  *Id.*  The Fourth Circuit determined that "[a]lthough [the contracting company] was the entity that formally fired [the plaintiff], [the defendant] had effective control over [the plaintiff's] employment."  *Id.; see also Crump*, 2015 WL 5601885, at *19 (noting that "the record establishe[d] that the Navy had at least partial authority to terminate Plaintiff's work [with a contracting company] because the Navy retained the authority to report [the contractor's] misconduct or deficiencies").  Accordingly, as in *Butler* and *Crump*, the first factor narrowly favors a finding that the NIH was Plaintiff's employer.

The second factor, whether the purported employer engaged in "day-to-day supervision of employees, including employee discipline," seeks to assess "to what extent the employee is supervised, [which] is useful for determining the day-to-day, practical control of the employee."  *Butler*, 793 F.3d at 414.  Although Defendant contends that Plaintiff was "supervised, evaluated[,] and disciplined by ISI according to ISI's employee

14

handbook," there is evidence that NIH officials also exercised significant day-to-day supervision over Plaintiff. Plaintiff provided administrative support for NIH employees, and his tasks were directed and coordinated by his NIH supervisors. (*See* ECF Nos. 19-4, at 4; 19-7, at 3). Plaintiff received "on-the-job training multiple times from Delois Holloway," an NIH employee. (ECF No. 19-4, at 3). Although Plaintiff formally requested leave from Mr. England at ISI, he was required to "coordinate" his request for leave with his NIH supervisors, and at times received direct "approval" from them. (ECF No. 25-27, at 1, 4). Finally, Defendant's representation that "only NIH is in a position to assess" whether Plaintiff is meeting his job requirements supports the notion that the NIH supervised Plaintiff's day-to-day performance.

Unsurprisingly, Defendant does not discuss the third factor of "whether the putative employer furnishes the equipment used and the place of work," which "is valuable for determining how similar the work functions are compared to those of an ordinary employee." *Butler*, 793 F.3d at 414-15. Plaintiff worked at the NIH and "worked side by side" with NIH employees. *Id.* at 415. When Plaintiff did not complete his tasks to the satisfaction of his NIH supervisors, other NIH employees stepped in to do so. (ECF No. 19-4, at 3-4). Plaintiff sat at an NIH desk, answered the NIH phone, and used NIH supplies. Accordingly, "there was

little or no effective difference between the work performed" by Plaintiff and NIH employees.  *Butler*, 793 F.3d at 415.

Keeping in mind that the first three factors "are the most important," the remaining factors further illustrate that, at least, there is a dispute as to whether the NIH was Plaintiff's employer.   The fourth factor weighs in favor of Defendant because ISI maintained possession of and responsibility over Plaintiff's employment records, including payroll, insurance, and taxes.   The fifth factor, the length of time Plaintiff has worked for the NIH, indicates that the NIH was Plaintiff's employer.   The Eastern District of Virginia, when applying this factor, noted that a one-year duration is "relatively short." *Crump*, 2015 WL 5601885, at *22.   Defendant contends that this favors a non-employer relationship because the NIH and ISI "entered into a new contract for [Plaintiff's] position on almost a yearly basis."   (ECF No. 19-1, at 19).   Although Plaintiff's employment was subject to renewal of his contract, he worked for the NIH, and the OA in particular, for nearly five years.

The sixth factor regarding which entity provides training cuts both ways.   Although it was ISI's official policy to provide Plaintiff formal training, Ms. Holloway provided Plaintiff with "on-the-job training," and there were training courses available to Plaintiff *at the NIH*, in which Mr. Rice,

16

Ms. Holloway, and Mr. England "encouraged" Plaintiff to enroll. (ECF Nos. 19-4, at 3-5; 19-5, at 3; 19-8, at 3). The seventh and eighth *Butler* factors, which assess whether Plaintiff's duties are "akin to a regular employee's duties" and if he was "assigned solely to" the NIH weigh in favor of an employer-employee relationship. Plaintiff was assigned only to NIH, and the OA specifically. Moreover, Plaintiff's work "was not tangential or peripheral to [the NIH]." *Butler*, 793 F.3d at 415. Rather, Plaintiff performed many of the same tasks as those performed by administrative assistants who were NIH employees. The ninth factor regarding the subjective intentions of the parties is inconclusive, and in any event, is "of minimal consequence in the joint employment analysis." *Id.* at 414 n.12.

Accordingly, there is evidence that the *Butler* factors support a finding that the NIH was Plaintiff's "employer" for Title VII purposes, and Defendant is not entitled to summary judgment on this ground. Although Plaintiff was technically a contractor, the Fourth Circuit's test "specifically aims to pierce the legal formalities of an employment relationship to determine the *loci* of effective control over an employee, while not discounting those formalities entirely. Otherwise, an employer who exercises actual control could avoid Title VII liability by hiding behind another entity." *Id.* at 415.

B.    Discrimination Claims

Title VII prohibits discrimination based on an employee's personal characteristics such as "race, color, religion, sex, or national origin."   42 U.S.C. § 2000e-2(a); *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S.Ct. 2517, 2525 (2013).   To survive a motion for summary judgment, a plaintiff must provide evidence of intentional discrimination through one of two avenues of proof: (1) direct or circumstantial evidence that discrimination motivated the employer's adverse employment decision; or (2) the *McDonnell Douglas* "pretext framework" that requires a plaintiff to show that "the employer's proffered permissible reason for taking an adverse employment action is actually a pretext for [discrimination]."   *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 285 (4th Cir. 2004) (en banc) (citing *Texas Dep't of Comm. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 807 (1973)).

Direct evidence is "evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear on the contested employment decision."   *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 520 (4th Cir. 2006) (internal quotation marks omitted).   "Only the most blatant remarks, [the intent of which] could be nothing other than to discriminate . . . constitute direct evidence of discrimination."   *Nana-Akua Takyiwaa Shalom v. Payless Shoesource Worldwide, Inc.*, 921

F.Supp.2d 470, 484 (D.Md. 2013) (citation and internal quotation marks omitted). Here, Plaintiff does not put forth any such direct evidence, and thus must proceed under the *McDonnell Douglas* burden-shifting framework.

Under the *McDonnell Douglas* framework, once a plaintiff meets his initial burden of establishing a *prima facie* case for discrimination, "the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action." *Id.* at 285. If the employer meets this burden of production, "the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the employer's stated reasons 'were not its true reasons, but were a pretext for discrimination.'" *Id.* (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000)). "The final pretext inquiry merges with the ultimate burden of persuading the court that [the plaintiff] has been the victim of intentional discrimination, which at all times remains with the plaintiff." *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294 (4th Cir. 2010) (internal quotation marks omitted).

**1.  Wrongful Termination**

To establish a *prima facie* case of wrongful termination, Plaintiff must show that: (1) he is a member of a protected class; (2) he suffered adverse employment action, which is satisfied by his termination; (3) he was performing his job

duties at a level that met his employer's legitimate expectations at the time of the adverse employment action; and (4) the position remained open or was filled by similarly qualified applicants outside the protected class. *Bonds v. Leavitt*, 629 F.3d 369, 386 (4th Cir. 2011) (citing *Hill*, 354 F.3d at 285).

Defendant argues that Plaintiff "fails to allege satisfactory job performance as required to satisfy the third element of a *prima facie* case." (ECF No. 19-1, at 25). Plaintiff has provided no evidence supporting his conclusory assertions that his job performance met the NIH's legitimate expectations. Plaintiff's own view of his performance is irrelevant. *See Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 280 (4th Cir. 2000). Similarly, the views of Ms. Richardson, Plaintiff's *former* supervisor are of little relevance, particularly because Plaintiff's job description and duties had changed since she was Plaintiff's supervisor. Mr. Rice believed that the new job description, which contained "Performance Analyst" duties, required more than the basic level of administrative and receptionist duties that Plaintiff was performing. (ECF No. 19-4, at 3). On multiple occasions Mr. Rice observed other employees completing Plaintiff's work, and he believed that Plaintiff did not demonstrate skills or complete tasks related to the majority of his job requirements. (*Id*. at 4).

Plaintiff's colleagues support Mr. Rice's contention that Plaintiff was failing to perform satisfactorily and up to Mr. Rice's expectations for the position. (ECF Nos. 19-5, at 3; 19-7, at 3). Mr. Rice attempted to work with Plaintiff to improve his performance. Although Mr. Rice, Mr. England, and others urged Plaintiff to enroll in training classes, Plaintiff never enrolled. Mr. England also met with Plaintiff to discuss specific areas of improvement, but Mr. Rice saw no improvement a month later. (*See* ECF Nos. 19-16; 19-17; 19-18). Accordingly, Plaintiff has failed to establish a *prima facie* case of discriminatory termination because he has not shown that he was meeting the NIH's legitimate performance expectations.

Even assuming Plaintiff could establish a *prima facie* case of wrongful termination, he has failed to show that Defendant's nondiscriminatory reason for termination was pretextual. Defendant asserts that Plaintiff's employment was terminated because "there had not been any substantial improvement in [Plaintiff's] work performance," Plaintiff had not signed up for training classes, and Plaintiff's supervisors at the NIH felt that "they were not getting the work or the value from the [new] position that is required to support the office and the Director." (ECF No. 19-18). Thus, even if Plaintiff were meeting certain job performance expectations or expectations under a previous job description, Mr. Rice and other NIH

21

officials believed that Plaintiff had not taken the necessary steps to fulfill the requirements of the most recent job description for the position.  According to Ms. Mack, another OA employee, Mr. Rice "wanted someone in the position who ha[d] more advanced computer skills" as well as the ability to perform quality assurance or program analyst duties "such as data calls, audit review and analysis." (ECF No. 19-7, at 3).

"A plaintiff demonstrates pretext by showing the employer's proffered nondiscriminatory reason is a lie and the real reason is based on discriminatory intent." *Smith*, 832 F.Supp.2d at 584 (citation and internal quotation marks omitted).  Plaintiff appears to contend that Defendant's reasons for his termination are pretextual because Mr. Rice commented on Plaintiff's accent and because Mr. Rice told a colleague that Plaintiff "did not have the appearance to be the face of the office." (ECF No. 25-2, at 27).

It is disputed whether Mr. Rice referred to Plaintiff's accent when discussing his performance.  Plaintiff avers that Mr. Rice told him that people could not understand him on the phone because of his accent and alleged lack of English proficiency. (ECF No. 19-3, at 8).  According to Mr. Rice, he never mentioned Plaintiff's accent, but asked him to speak more clearly and loudly when answering the telephone. (ECF No. 19-4, at 5).  Even if Mr. Rice referenced Plaintiff's accent, such a

remark, made in the context of Mr. Rice's legitimate assessment of a critical aspect of Plaintiff's job, does not show pretext for discrimination. *See E.E.O.C. v. Orkin Exterminating Co.*, 63 F.Supp.2d 684, 692 (D.Md. 1999) (noting that an adverse employment action may permissibly be "based upon an employee's accent if that accent 'interferes materially with job performance'" (quoting *Fragante v. City and Cnty. Of Honolulu*, 888 F.2d 591, 596 (9th Cir. 1989))). In addition, Mr. Rice's purported statement that Plaintiff did not have the appearance to be the "face of the office" is an incomplete quotation. Plaintiff's colleague, Ms. Mack, avers that Mr. Rice told her that he was terminating Plaintiff because he "lacked a sufficient level of skill and did not have the appearance to be the 'face of the office,'" which Ms. Mack believed referred "to the fact that [Plaintiff] wore jeans everyday rather than business casual." (ECF No. 19-7, at 4). In light of the evidence regarding Plaintiff's job performance, this statement does not establish that Defendant's legitimate, nondiscriminatory reason for terminating Plaintiff's employment was a pretext for discrimination.

## 2. Restriction on Playing Music

Plaintiff alleges that he was discriminated against based on his religion because Mr. Rice restricted his playing of religious music while his colleagues were allowed to play music

in their offices.   Defendant counters that Mr. Rice put the restriction in place due to Plaintiff's location at the front reception desk and not for any prohibited discriminatory purpose.   "Courts have recognized that employees may utilize two theories in asserting religious discrimination claims.   These theories are denominated as the 'disparate treatment' and 'failure to accommodate theories.'"   *Chalmers v. Tulon Co. of Richmond*, 101 F.3d 1012, 1017 (4th Cir. 1996) (citation omitted). Although it is not clear under which theory Plaintiff brings his religious discrimination claim, Plaintiff fails to establish a *prima facie* case under either.

  a. **Disparate Treatment**

  To succeed on a disparate treatment claim, a plaintiff must "demonstrate that [the NIH] treated [him] differently than other employees because of [his] religious beliefs."   *Adams v. Trustees of the Univ. of N.C.-Wilmington*, 640 F.3d 550, 558 (4th Cir. 2011) (internal quotation marks omitted) (citing *Chalmers*, 101 F.3d at 1017).   "The evidentiary burdens placed on the employee under this theory mirror those placed on employees alleging employment discrimination based on race or sex," and a plaintiff can satisfy this burden either by presenting direct evidence of discrimination or by utilizing the *McDonnell Douglas* burden-shifting framework.   *Chalmers*, 101 F.3d at 1017.

"As with sex, race, color, and national origin, a plaintiff claiming religious discrimination under Title VII must show adverse employment action." *Ali v. Alamo Rent-A-Car, Inc.*, 8 F.App'x 156, 158 (4th Cir. 2001); *see also Adams*, 640 F.3d at 558. For disparate treatment claims, an adverse employment action is a discriminatory act that adversely affects the "terms, conditions, or benefits" of employment. *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir. 2004). Typically, an adverse employment action includes "discharge, demotion, decrease in pay or benefits, loss of job title or supervisory responsibility, or reduced opportunities for promotion." *Boone v. Gordin*, 178 F.3d 253, 255 (4th Cir. 1999). Here, Mr. Rice's request that Plaintiff restrict the hours he could play music at the reception desk was not an adverse employment action, and there is no indication that Plaintiff was fired or otherwise disciplined for playing religious music. Accordingly, Plaintiff is unable to establish a *prima facie* case of disparate treatment.[4]

---

[4] Defendant asserts that Plaintiff was restricted from playing music because Mr. Rice believed that it was unprofessional to have music playing at the OA's front reception desk. Even if Plaintiff could establish a *prima facie* case of disparate treatment, he has failed to show that this non-discriminatory reason was a pretext for discrimination.

   b.   **Failure to Accommodate**

To establish a *prima facie* failure to accommodate claim, a plaintiff must show that: "(1) he or she has a bona fide religious belief that conflicts with an employment requirement; (2) he or she informed the employer of this belief; and (3) he or she was disciplined for failure to comply with the conflicting employment requirement." *E.E.O.C. v. Firestone Fibers & Textiles Co.*, 515 F.3d 307, 312 (4th Cir. 2008) (citation and internal quotation marks omitted).  Defendant argues that playing religious music was not a "bona fide religious belief" and that Plaintiff was not "disciplined or discharged for failure to comply" with Mr. Rice's restrictions.

The Fourth Circuit has held that although "an employer has a duty to accommodate an employee's religious beliefs, the employer does not have a duty to accommodate an employee's preferences." *Dachman v. Shalala*, 9 F.App'x 186, 192 (4th Cir. 2001) (citing *Tiano v. Dillard Dep't Stores, Inc.*, 139 F.3d 679, 682 (9th Cir. 1998)).  In *Dachman*, the plaintiff asserted that her employer's refusal to allow her to leave work early on Fridays to purchase challah bread for observance of the Sabbath was a failure to accommodate her religious beliefs.  The district court held that she "failed to establish that she had a bona ride religious belief that conflict[ed]" with her employer's leave restriction because the purchase of challah

bread was not "mandatory" for her religious observance. *Dachman v. Shalala*, 46 F.Supp.2d 419, 439 (D.Md. 1999). The Fourth Circuit affirmed, noting that the plaintiff's desire to pick up challah bread on Friday afternoons "was simply her preference and not a religious requirement." *Dachman*, 9 F.App'x at 192. Here, Plaintiff does not allege, and has put forth no evidence showing, that playing religious music during work hours is a religious *requirement*. Accordingly, Plaintiff has failed to establish the first element of a *prima facie* failure to accommodate case.

Moreover, "[i]n a traditional accommodation case, a plaintiff brings suit because [he] has suffered some discipline because of a conflict between [his] employment obligations and [his] religious practices. . . . [T]he discipline at issue is usually 'discharge, demotion, decrease in pay or benefits, loss of job title or supervisory responsibility, or reduced opportunities.'" *Abdelkader v. Sears, Roebuck & Co.*, 780 F.Supp.2d 389, 395 (D.Md. 2011) (citations omitted) (quoting *Boone*, 178 F.3d at 255). That is, to satisfy the third element of a *prima facie* case, a plaintiff must show that he was disciplined in some way connected to his religious belief. In *Abdelkader*, the plaintiff asserted that she was required to work certain Fridays even though she requested Fridays off for religious observance. The district court held that the

27

plaintiff failed to establish a *prima facie* failure to accommodate case because she was not "coerced" into working on Fridays and she was not disciplined or terminated for her refusal to work on Fridays. *Id.; see Mehar v. 7-Eleven, Inc.*, No. AW-06-1776, 2007 WL 8045972, at *5 (D.Md. May 29, 2007) (holding that because the plaintiff did not leave work to attend a religious ceremony, "she was not disciplined for her failure to comply" with the company policy, and "her religious accommodation claim fails"). Here, Plaintiff was not disciplined or terminated for playing religious music. Conversely, Mr. Rice requested that Plaintiff limit the hours he played religious music at the reception desk and Plaintiff complied. Accordingly, Plaintiff cannot establish a *prima facie* case for failure to accommodate.

### 3. Denial of Training

Plaintiff alleges that he was discriminated against by Mr. Rice when he was denied training in July 2010. (ECF No. 1, at 1). Defendant counters that Plaintiff's denial of training claim is time-barred. (ECF No. 19-1, at 21-22).

> Prior to pursuing Title VII discrimination and retaliation claims in district court, a federal employee must timely exhaust all available administrative remedies. *See* 42 U.S.C. § 2000e-16(c); 29 C.F.R. § 1614.407; *Blount v. Shalala,* 32 F.Supp.2d. 339, 341 (D.Md. 1999). EEOC regulations require a federal employee complaining of discrimination in employment

> to initiate contact with an EEO counselor
> within 45 days of the alleged discriminatory
> act, or in the case of a personnel action,
> within 45 days of the effective date of the
> action.   29 C.F.R. Part 1614.105(a)(1).   A
> complainant's failure to make this contact
> within the 45-day window is tantamount to
> failure to timely exhaust all administrative
> remedies.   This failure ordinarily results
> in dismissal of a complaint of
> discrimination. *See e.g. Jakubiak v. Perry,*
> 101 F.3d 23, 26-27 (4th Cir. 1996).   On the
> other hand, the timely filing of a complaint
> with the EEOC is not a jurisdictional
> requirement and the Government's argument of
> untimeliness *may* be subject to the doctrine
> of equitable estoppel. *Zografov v. Virginia
> Medical Center,* 779 F.2d 967, 969 (4th Cir.
> 1985).   However, the Government will only be
> estopped from asserting the time limit as a
> defense if plaintiff provides proof of
> affirmative misconduct on the part of the
> agency which prevented an employee from
> timely filing a complaint. *Id.; Nealon v.
> Stone,* 958 F.2d 584, 589 (4th Cir. 1992).

*Blount v. Dep't of Health & Human Servs.*, 400 F. Supp.2d 838, 840-41 (D.Md. 2004), *aff'd sub nom. Blount v. Thompson*, 122 F.App'x 64 (4th Cir. 2005).   Here, Plaintiff did not initiate contact with an EEO counselor until April 2011, well over 45 days after he was allegedly denied training.   Plaintiff asserts that "[w]hen he spoke to [his] colleagues nobody knew [he] was entitled to file a complaint under Title VII" because he was a contractor.   (ECF No. 25-2).   These assertions do not affirmatively allege misconduct on behalf of the NIH sufficient to invoke equitable estoppel.   Accordingly, Defendant's motion

for summary judgment will be granted as to Plaintiff's denial of training claim.

### C.   Hostile Work Environment

Plaintiff contends that he was harassed because of Mr. Rice's "use of derogatory comments about [Plaintiff's] accent, purported lack of proficiency and lack of competence." (ECF No. 1, at 1).   Defendant argues that Plaintiff has failed to establish a *prima facie* case because he has not shown that Mr. Rice's conduct was motivated by race or national origin and because the conduct was not sufficiently severe. (ECF No. 19-1, at 37-42).

To establish a *prima facie* case of hostile work environment, a plaintiff must show that there is: (1) unwelcome conduct; (2) that is based on the plaintiff's race [or national origin]; (3) which is sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer. *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015); *Okoli v. City Of Baltimore*, 648 F.3d 216, 220 (4th Cir. 2011).   Courts determine whether an environment is sufficiently hostile or abusive by looking at all of the circumstances, "including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it

unreasonably interferes with an employee's work performance." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998) (citation and internal quotation marks omitted).

Although Title VII "surely prohibits an employment atmosphere that is permeated with discriminatory intimidation, ridicule, and insult, it is equally clear that Title VII does not establish a general civility code for the American workplace." *E.E.O.C. v. Sunbelt Rentals*, 521 F.3d 306, 315 (4th Cir. 2008) (citations and internal quotation marks omitted). In determining whether the offending conduct was sufficiently severe or pervasive, the court must consider: "(1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with an employee's work performance." *Smith v. First Union Nat. Bank*, 202 F.3d 234, 242 (4th Cir. 2000); *see also Sunbelt Rentals*, 521 F.3d at 315. Plaintiff must show not only that he subjectively believed that his workplace environment was hostile, but also that an objective, reasonable person would have found it to be hostile. *Sunbelt Rentals*, 521 F.3d at 315. "The behavior need not be both severe and pervasive: the more severe the conduct, the less pervasive the plaintiff need prove that it is." *Williams v. Silver Spring Volunteer Fire Dept.*, 86 F.Supp.3d

398, 413 (D.Md. 2015) (citing *Reed v. Airtran Airways*, 531 F.Supp.2d 660, 669 n.15 (D.Md. 2008)).

Even if Plaintiff could establish that Mr. Rice's comments were based on Plaintiff's race or national origin, the isolated comments do not meet the "high bar in order to satisfy the severe or pervasive test." *Sunbelt Rentals*, 521 F.3d at 315-16. The comments were not pervasive and were related to Plaintiff's performance. In short, Mr. Rice's conduct falls far short of establishing an objectively severe or pervasive hostile work environment. *See Khoury v. Meserve*, 268 F.Supp.2d 600, 614 (D.Md. 2003) (holding that a plaintiff's allegations that her supervisor "yelled at [her], told her she was incompetent, pushed her down in her chair, and blocked the door to prevent [her] from leaving while he continued to hell at her" were not sufficient to establish a hostile work environment claim). Accordingly, Defendant is entitled to summary judgment on Plaintiff's hostile work environment claim.

## IV. Conclusion

For the foregoing reasons, Defendant's motion to dismiss or, in the alternative, for summary judgment will be granted. A separate order will follow.

                                   /s/
                         DEBORAH K. CHASANOW
                         United States District Judge